**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **EVA JEANETTE BENTLEY,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **No. 3:10-CV-0032-L** |
| | § | |
| **COMMISSIONER OF THE** | § | |
| **SOCIAL SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

This is an appeal from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim of Eva Jeanette Bentley ("Plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Act. The Court considered Plaintiff's Brief, Defendant's Brief, and Plaintiff's Reply Brief. The Court reviewed the record in connection with the pleadings. The final decision of the Commissioner should be **REVERSED** and **REMANDED** for further proceedings.

## Background[1]

## Procedural History

On January 9, 2007, Plaintiff filed an application for SSI benefits, alleging disability beginning July 1, 2006. (Tr. at 18.) The claim was denied initially on March 23, 2007, and upon reconsideration on May 15, 2007. (Tr. at 18.) Thereafter, Plaintiff filed a written request for hearing on July 30, 2007. (Tr. at 13.) Plaintiff appeared at a hearing held on June 19, 2008, in Dallas, Texas, where attorney Joseph Eads represented her on behalf of Bill Gordon and Associates. (Tr. at 63.) This hearing was continued because of lack of recent medical evidence in the record. (Tr. at 67-68.)

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

Plaintiff was then scheduled for a hearing on October 1, 2008, in Dallas, Texas, that was continued because Plaintiff could not arrange transportation to the hearing site. (Tr. at 122, 147.) Plaintiff appeared and testified at a hearing held on January 15, 2009, in Dallas, Texas, where attorney Dan Skaar, on behalf of Bill Gordon and Associates, represented her. (Tr. at 29.)

In the decision, Arthur J. Schultz, the Administrative Law Judge ("ALJ") determined that Plaintiff had not performed substantial gainful activity since her alleged date of disability of July 1, 2006, and suffered from severe impairments including severe status post right hip replacement, hypertension, and fatty liver. (Tr. at 21.) *See Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1999). The ALJ also found Plaintiff's hyperthyroidism to be a non-severe impairment under the *Stone* standard. *Id.* Additionally, the ALJ found that Plaintiff's impairments, taken individually or in combination, did not meet or medically equal the criteria for any Listing, although no specific Listing was identified. (Tr. at 21, 25.) *See* 20 C.F.R. § 404, subpt. P, app. 1 (2008).

The ALJ found that Plaintiff's impairments met the Administration's definition of disability from July 1, 2006 through August 28, 2007, because her residual functional capacity("RFC") would not allow her to maintain attendance to complete an 8-hour day or 40 hours per week on a sustained basis during that period. (Tr. at 22.) However, the ALJ determined that medical improvement occurred on August 29, 2007, ending Plaintiff's disability. (Tr. at 24.) Specifically, the ALJ found that on and after August 29, 2007, Plaintiff's RFC allowed her to lift and carry 10 pounds occasionally; sit for 6 hours in an 8-hour workday; stand and/or walk for two hours of an 8-hour workday; occasionally use ramps/stairs, balance, stoop, kneel, crouch, and crawl; but would not allow her to climb ropes or ladders, or work in proximity to hazards. (Tr. at 25.) It appears this conclusion was based on a misreading of the medical records because, in Finding No. 4, the ALJ states that Plaintiff underwent hip replacement surgery in May of 2006, rather than May of 2007. (Tr. at 22, 323-325.)

2

During the hearing, the ALJ posed a hypothetical to the Vocational Expert ("VE") using an individual of the same age, education, and work history as Plaintiff with the abovementioned RFC, however the ALJ added the restriction of the need to stand up and stretch at 30-45 minute intervals, as opined by the medical expert ("ME"), Doctor Billinghurst, during his testimony. (Tr. at 57.) The VE testified that the hypothetical claimant could perform the occupations of document preparer (DOT 249.587-018), check cashier (DOT 211.462-026), and surveillance system monitor (DOT 379.367), all of which were available both nationwide and in the state of Texas. (Tr. at 53-56.) The ALJ concluded that Plaintiff was not disabled after August 28, 2007, because there were a sufficient number of occupations available in both Texas and the national economy that Plaintiff could perform given her RFC. (Tr. at 20.) Plaintiff filed a timely request for review with the Appeals Council on March 23, 2009, which was denied on November 16, 2009. (Tr. at 6-8, 12-13.) Plaintiff filed a timely complaint against the Commissioner with this Court on January 9, 2010.

## Plaintiff's Age, Education, and Work Experience

Plaintiff was born on April 6, 1962, making her 44 years old at the time of filing for disability benefits and 46 years old at the time of the January 2009 hearing. (Tr. at 32, 36.) Plaintiff testified to graduating from high school without any further education. (Tr. at 37.)

## Plaintiff's Medical Evidence

During the hearing, the ME gave a history of Plaintiff's condition from the medical records, noting that she had a recent diagnosis of cirrhosis of the liver as well as nonalcoholic steatohepatitis (NASH), which is a condition associated with a fatty liver. (Tr. at 30.) The ME also gave the history of Plaintiff's hip impairment beginning with an MRI in November of 2005 that he testified indicated only some degenerative changes. However, the MRI findings indicate much more, such as marrow

edema and subchondral and cortical irregularity of the lateral aspect of right femoral head and neck, with associated osseous proliferative on the lateral aspect of the acetabula on both sides, femoral acetabular impingement on the right side, and potential impingement on the left side. (Tr. at 313.) Additionally, Dr. Moore, who interpreted the MRI, suspected large, mature osseous proliferative changes on the lateral aspect of both sides of Plaintiff's acetabular roots. (Tr. at 313.)

The ME testified that Plaintiff was seen in March of 2006 by Dr. Srivathanakul, her long-time treating physician, experiencing right hip pain that had been present for the previous six months and limited her range of motion. (Tr. at 31, 53.)  The ME noted that Plaintiff had undergone injections into the bursa area of the hip that did not relieve either the pain or range of motion restrictions. (Tr. at 31). The ME incorrectly stated that Plaintiff underwent a "right total knee replacement" rather than a right hip replacement on May 9, 2007. (Tr. at 31, 323-325.)  The ME also reported a 13-month gap in the medical records from May of 2007 to July of 2008. (Tr. at 32.)  However, the ME failed to discover, or consider in his opinion, the available records from Plaintiff's appointments with Dr. Srivathanakul in June and August of 2007, as well as in March, April, and June of 2008, for continuing severe right hip pain and onset of severe back pain related to her osteoarthritis. (Tr. at 117-119, 296, 304-305, 375-381.) The records that the ME missed included referrals for orthopedic visits, X-Rays, a lumbar MRI, and epidural lumbar injections.

On April 25, 2008, Dr. Srivathanakul completed an assessment of his patient's ability to perform work related activities. (Tr. at 117-119, 298-301.)  In his professional opinion, Plaintiff's pain and complications from her hip replacement and arthritis would not allow her to perform sustained full time employment and would cause her to be absent for more than three days per month from any attempt at full time employment. (Tr. at 119.)  Specifically, he found that Plaintiff could

lift and carry less than 10 pounds on an occasional basis, could stand and walk for less than two hours of an 8-hour day, and could sit for less than two hours in an 8-hour day. (Tr. at 117.) He also found that she could only sit or stand for 20 minutes at one time before needing to change positions at will to standing or sitting. (Tr. at 118.) Additionally, she would be required to walk for some period to loosen up after 20 minutes of sitting. (Tr. at 118.) With respect to postural limitations, he found that Plaintiff should never stoop, crouch, balance, or climb. (Tr. at 118.)

The ME testified that Plaintiff began using a cane to assist in ambulation in January of 2008 and continued to require the cane for ambulation at her orthopedic visit in July of 2008, where she was experiencing increasing right hip and low back pain. (Tr. at 32, 303.) At that appointment, although X-Rays indicated that the replacement hip hardware was in proper alignment, Plaintiff was still in tremendous pain, especially in the mornings, and was actually experiencing more pain one year after the surgery than before the surgery. (Tr. at 303-304, 496.) She experienced a "popping and grinding" sensation with ambulation and a sensation "like a Stickney is pushing up and down on her leg." (Tr. at 303, 496.) The pain was worse with sitting, and walking tended to ease the pain somewhat. *Id*. Plaintiff also continued to have knee and low back pain of an 8 of 10, ambulated with a limp, and continued to require a cane for ambulation. *Id*. Plaintiff's right hip flexion was limited to 50 of 135 degrees and extension was also abnormal. *Id*.

In July of 2008, Plaintiff's hip surgeon, Dr. Bucholtz, ordered an X-Ray of her hip after she continued to experience hip pain and difficulty ambulating. (Tr. at 492, 495.) The X-Ray revealed multiple abnormalities, including new abnormal bone formations in the soft tissue adjacent to the area of the hip replacement (heterotopic ossification); her bones had lost the normal density (osteopenic); and osteoarthritis (degenerative change) was evident in the left hip. *Id*. Additionally her lumbar spine

indicated osteoarthritis (degenerative change), but the extent was not identified. *Id.* In October of 2008, Plaintiff followed up with orthopedist Dr. Gary as well as Dr. Bucholtz as her hip, knee, and low back pain continued unabated at a 6 of 10. (Tr. at 492, 494.) Plaintiff continued to require the assistance of a cane for ambulation, and reported that her knee "gives out" at times causing her to fall. (Tr. at 492.) The physical exam revealed right hip range of motion limitations in flexion (120 of 135 degrees), internal rotation (20 of 35 degrees), external rotation (30 of 45 degrees), and abduction (30 of 45 degrees). *Id.* Additionally, Plaintiff's knee was tender in the area of the patellar tendon. *Id.* Although he did not attempt to identify the cause of Plaintiff's ongoing hip pain, Dr. Bucholtz, the surgeon who preformed the procedure, reported that her hip appeared "to be doing well." (*Id.*)

Plaintiff followed up with Dr. Srivathanakul again in September and November of 2008, continuing to suffer chronic pain in her knee and hip. (Tr. at 367, 371-373.) Her hip pain continued to be greater than before the 2007 hip replacement and she was falling about twice a month because of instability from her impaired knee and hip. *Id.* In September of 2008, Dr. Srivathanakul prescribed Plaintiff a pronged cane for assistance in ambulation after her physical exam revealed an abnormal gait, loss of knee range of motion, and knee and hip arthritis. *Id.* On January 2, 2009, Dr. Srivathanakul completed another medical source statement assessing Plaintiff's ability to perform work related functions in which he stated that Plaintiff's restrictions remained unchanged from the April 2008 assessment. (Tr. at 345.)

**Plaintiff's Testimony at the Hearing**

Plaintiff's testimony was consistent with her statements from her Disability Reports and medical records. (Tr. at 110-113.) She testified to gaining approximately 30 pounds over the last three years coincident with the onset of her knee and hip impairments. (Tr. at 36-7.) She noted that the ME did not address her issues with knee pain and instability or the fact that she completed, without significant improvement, a full physical therapy regimen for 6 to 7 weeks during July through October of 2008. (Tr. at 41-42.) Plaintiff testified that her primary impairment is hip pain, which is a consistent 6 of 10 during the day since her hip replacement, increasing to a 7 of 10 at night because of pressure on the hip, resulting in insomnia and daytime fatigue. (Tr. at 43-44.) She described experiencing the same "popping" and "pressure" from the area of her hip replacement when walking that was documented in her medical records. (Tr. at 46.) Plaintiff reported that since 2002 she has experienced right knee pain and weakness, mainly when standing and walking, that has resulted in increased instability causing her to fall at least 25 times since her hip replacement surgery, with an average of two falls per month. (Tr. at 45-48.) Plaintiff resorted to the use of a cane to assist with ambulation because of the numerous falls caused by her knee and hip instability. (Tr. at 45.)

Plaintiff also described some of her physical functional limitations caused by her hip, low back, and knee pain. She reported that she had the ability to stand and walk for a total of 30 minutes at one time before she needed to sit down and rest. With her slow pace, it would require 15 minutes for her to walk a city block. (Tr. at 50-51.) When she sits, the chair she sits in must be heavily padded or she must sit on at least one pillow due to pain in her hip area. (Tr. at 51.) She can only sit in one position for 15 minutes before pain and discomfort require her to shift to a new position in the chair and then she must get up from the seated position after a total of 30 minutes due to pain and discomfort. (Tr. at 51.) She must use a bar stool when she cooks, and she cannot sit on low chairs,

such as a couch, because of pain and discomfort. (Tr. at 42, 51.) The most comfortable position for her is sitting in her special oversized chair using four strategically-placed pillows to increase her comfort. (Tr. at 51.) Because of her impairments, her activities of daily living are limited. She cannot sweep or vacuum, cannot clean a bathtub, cannot grocery shop alone, cannot lift more than a gallon of milk, and cannot bathe in a bathtub. (Tr. at 52.)

Plaintiff testified that she was scheduled for an inpatient admission at Parkland Hospital in February of 2009, subsequent to the hearing, for a biopsy of her liver to determine the severity of her liver impairment. (Tr. at 49.)

## Standard of Review

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability.

*Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled.  *Id.*

The Commissioner's determination is afforded great deference.  *Leggett*, 67 F.3d at 564.

Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits

is supported by substantial evidence and to whether the proper legal standard was utilized.

*Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g).  Substantial evidence

is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to

support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett*,

67 F.3d at 564.  The reviewing court does not reweigh the evidence, retry the issues, or substitute its

own judgment, but rather scrutinizes the record to determine whether substantial evidence is present.

*Greenspan*, 38 F.3d at 236.  However,  "[t]he ALJ's decision must stand or fall with the reasons set

forth in the ALJ's decision, as adopted by the Appeals Council."  *Newton v. Apfel*, 209 F.3d 448, 455

(5th Cir. 2000).  Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" and instruct

claimants how the Commissioner will consider the opinions.[2]  In the Fifth Circuit, "the opinion of

---

[2]  The terms of 20 C.F.R. § 404.1527(a)(2) provide:

(2) Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical

the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton*, 209 F.3d 448, 455 (5th Cir. 2000); *see Floyd v. Bowen,* 833 F.2d 529, 531 (5th Cir.1987).

### Issues

Plaintiff contends that the ALJ's RFC finding that Plaintiff had a restricted sedentary RFC is based upon reversible error because the ALJ improperly weighed the opinions of Plaintiff's treating physicians; the opinion was not based on substantial evidence; and the ALJ improperly discredited Plaintiff's credibility. Plaintiff further asserts that the decision must be reversed and remanded because the ALJ failed to indicate which listing(s) he considered or provide any reasoning as to why Plaintiff's impairments failed to meet the criteria for the listing(s). Finally, Plaintiff argues that the decision must be reversed and remanded because the occupations that the ALJ found Plaintiff could perform were not based on the RFC stated in the hypothetical to the VE and the VE's testimony was inconsistent with the *Dictionary of Occupational Titles*, U.S. Dep't of Labor, (4th ed., rev. 1991) ("DOT").

The Commissioner responds that substantial record evidence and relevant legal standards support the Commissioner's finding that Plaintiff was not disabled as of August 29, 2007.

support the Commissioner's finding that Plaintiff was not disabled as of August 29, 2007.

### Analysis

### Did the ALJ Apply the Proper Legal Standards in Evaluating the Opinions of the Treating Physician, Dr. Srivathanakul and the ME?

---

sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The ALJ is required to give controlling weight to a treating physician's opinion if the ALJ finds that opinion to be well supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. *See* 20 C.F.R. § 404.1527(d)(2). In many cases, a treating physician's opinion is entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. *See* SSR 96-2p. A treating physician's opinion, however, may be disregarded when good cause is shown. *Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir. 1995); *Leggett,* 67 F.3d at 566. If good cause exists, then the ALJ may accord the treating physician's opinion less weight, little weight, or even no weight. *Paul,* 29 F.3d at 211; *Leggett,* 67 F.3d at 566. "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995) (citation omitted). If the ALJ does not accord a treating doctor's opinion controlling weight, the ALJ must set forth specific reasons for the weight given, supported by the evidence in the case record. *See* 20 C.F.R. § 404.1527(d)(2). The reasons must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. The ALJ must explain the weighing in the decision, and the weight will stand or fall on the reasons set forth in the opinion. *Newton*, 209 F.3d at 455.

An ME is an expert who did not examine the claimant but who heard and reviewed the medical evidence and was qualified to offer an opinion. *See Richardson v. Perales*, 402 U.S. 389, 396 (1971). Although the United States Supreme Court has approved the use of an ME, nevertheless, the ALJ must evaluate the ME's opinion in accordance with the regulatory criteria for weighing medical opinions. *See* 20 C.F.R. § 404.1527(d)(1)-(6). For an ALJ to properly rely on the testimony of an ME, the testimony must be supported by the medical evidence of record. *See Carey v. Apfel*,

230 F.3d 131, 143 (5th Cir. 2000) (recognizing that an ALJ should not rely on a medical expert's inaccurate, erroneous, or internally inconsistent testimony regarding the medical evidence). When a non-examining physician makes specific medical conclusions that either contradict or are unsupported by findings made by an examining physician, his or her conclusions do not provide substantial evidence as a matter of law. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Strickland v. Harris,* 615 F.2d 1103, 1109-10 (5th Cir. 1980). *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Johnson v. Harris*, 612 F.2d 993, 996-98 (5th Cir. 1980).

The ALJ determined that Plaintiff was unable to maintain attendance to complete an 8-hour day or 40-hour week on a sustained basis from July 1, 2006 through August 28, 2007, but that she was not disabled beginning August 29, 2007. The ALJ incorrectly noted that Plaintiff's hip replacement surgery was in May 2006, rather than May 2007, when the surgery actually occurred. Thus, the ALJ evidently failed to recognize that Plaintiff was only post-hip-replacement surgery three to four months at the time he found that her disability ended.[3]

At Plaintiff's hearing, an internist, Dr. Billinghurst, M.D., testified as an ME.[4] The ALJ's decision gives more weight to "the ME who reviewed all the medical evidence of record" than to Plaintiff's treating physician, Dr. Srivathanakul. (Tr. 23.) As a matter of law, the ME's testimony was inaccurate, erroneous, internally inconsistent, and not supported by the record. The ME's flawed testimony indicated that Plaintiff underwent a right total knee replacement on May 9, 2007. (Tr. 22.) Based on the ME's testimony, the ALJ found the following month Plaintiff was doing well "with relative good range of motion." (*Id*.) The ALJ stated that the ME noted that there was a gap in the

---

[3] The Commissioner dismisses this as a "typographical error."

[4] Tr. 583-610.

medical records of about 13 months. In fact, the record contained no gap and what the ALJ considered to be the ME's "review of all the medical evidence" failed to include 13 months of treatment notes. (Tr. 22.) The ME's testimony is not supported by substantial evidence, and the ALJ committed reversible legal error by giving it undue weight.

In addition to failing to satisfy *Newton*'s requirements, the ALJ's explanation for rejecting the treating physician's findings is based upon mistakes and faulty reasoning. The ALJ stated:

> I reject the opinion of Dr. S. Srivathanakul as to the claimant's limitations for lifting 10 pounds, walking less than 2 hours and sitting less than 2 hours (Exhibit 7F). Dr. Srivathanakul was not the orthopedic doctor. In addition, the claimant's records show at Exhibit 11F/36 a plan for exercise in March 2006. At Exhibit 11F/3 the claimant reported pain at 8/10 for one week on June 3, 2008. At that time. Dr. Srivathanakul referred her for physical therapy. I noted that this was after the hearing notice was sent in May 2008. But, on September 17, 2008, the claimant reported she had no pain (Exhibit 11F/27). On November 19, 2008 she was seen for fatty liver and reported no pain (Exhibit 11F/23).

(Tr. 23.) As a matter of law, this explanation does not provide good cause for rejecting the treating physician's opinions. Although it is true that Plaintiff's treating physician was not an orthopedic doctor, neither was the ME, the non-examining physician whose opinions the ALJ adopted. The reference to a plan for exercise in March 2006 is in fact a reference to a record from March 2008 which confirms the ongoing diagnosis of right hip arthritis, and contains the word "exercise." (Tr. 23, 381.) Dr. Srivathanakul sent Plaintiff to physical therapy later in 2008, but the physical therapy was not successful. (Tr. 23, 41, 381.) Physical therapy, medication, and surgery are all recognized treatments for arthritis. Dr. Srivathanakul's assessment of Plaintiff's ability to perform work related functions did not change between his first report in April 2008 and his second report in January 2009, after the unsuccessful physical therapy. (Tr. 117-19, 298-301, 345.)

13

The ALJ acknowledges Plaintiff's continuing severe pain in June of 2008 and participation in physical therapy, but discounts this report as unreliable because of its proximity to the notice of hearing, speculating that she invented or exaggerated her pain for the hearing's sake. Equally uncompelling and misleading is the ALJ's report of Plaintiff's failure to report pain at her September 17, 2008 appointment. (Tr. 372.) This is inexplicable because the September record clearly states that Plaintiff's chief complaints are "right hip and knee pain since May of 2007, worse now. Patient falls about 2 times per month." (Tr. 372.) Additional pages dated September 17, 2008, show a prescription of a pronged cane because of Plaintiff's abnormal gait and lack of stability, alignment, and range of motion in her right knee. (Tr. 371, 373.) Finally, the ALJ discredits Dr. Srivathanakul's opinion because Plaintiff reported no hip pain at a November 2008 appointment focused on the character and severity of her liver diagnosis. The Court finds no reason that Plaintiff should have reported hip pain at a consultation to discuss her liver. The liver consultation resulted in an appointment for a liver biopsy. The Court finds that the ALJ's explanations for rejecting the treating physician's opinions are mistake-ridden, not well-reasoned, and not supported by substantial evidence.

Although the Commissioner argues that the ALJ did not reject the treating physician's professional opinions, this is not apparent from the ALJ's decision "which must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton*, 209 F.3d at 455. The ALJ did not rely upon the ground that the opinions invaded the province of the  ALJ to determine disability.

Plaintiff argues that the ALJ erred by failing to weigh the factors set forth in § 404.1527(d)(2). The Court agrees. Section 404.1527(d)(2) requires the ALJ to consider specific factors "to assess the

14

weight to be given to the opinion of a treating physician when the ALJ determines that [the opinion] is not entitled to 'controlling weight.'" *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). *See also* S.S.R. 96-2p. Specifically, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the support for the treating physician's opinion, (4) the consistency of the treating physician's opinion with the record as a whole, (5) the treating physician's specialization, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(d)(2). *See also Newton*, 209 F.3d at 456.

In this case, after attempting to explain his reasons for not granting "controlling weight" to the treating physician's opinions, the ALJ neither cited nor applied the § 404.1527(d)(2) factors. The ALJ's "controlling weight" analysis, although arguably touching on a couple of the § 404.1527(d)(2) factors, does not encompass *all* of the factors. (*Id*.) It is well established that an ALJ must consider all of the § 404.1527(d) factors if "controlling weight" is not given to a treating physician's medical opinions. 20 C.F.R. § 404.1527(d) ("Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion."). *See also Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *McDonald v. Apfel*, No. 3:97-CV-2035-R, 1998 WL 159938, at *8 (N.D. Tex. Mar. 31, 1998). Thus, the ALJ did not follow § 404.1527(d)(2) in form or in substance.

Plaintiff was prejudiced because Dr. Srivathanakul had been Plaintiff's treating physician for over four years and had examined Plaintiff every three months, except when interrupted by specialist appointments. (Tr. 241, 260-72, 292-93, 295-96, 298-301, 340, 345, 348, 355-56, 367-69, 371-90, 431-46.) Dr. Srivathanakul's records consistently indicate diagnosis of hip and knee pain as well as low back pain during the relevant post hip replacement period. (*Id*.) Failure to consider and

explain these factors requires that the decision of the ALJ should be reversed and remanded to comply with § 404.1527(d)(2).

### Whether the ALJ's Opinion is Supported by Substantial Evidence

Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

An ALJ may not arbitrarily ignore uncontroverted medical evidence. *Goodley v. Harris,* 608 F.2d 234, 236-37 (5th Cir. 1979) (citing *Mims v. Califano,* 581 F.2d 1211 (5th Cir. 1978)). Although an ALJ is not required to address each and every medical record of a treating physician, the ALJ is required to consider all the evidence in making his determinations. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). "[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Id.*

Four factors constitute substantial evidence: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the plaintiff's age, education, and work history. *Fraga v. Bowen*, 810 F.2d at 1302, n.4 (5th Cir. 1987).

As previously stated, the ALJ found Plaintiff disabled by Regulations from July 1, 2006 through August 28, 2007, however the ALJ determined that medical improvement occurred on August 29, 2007, ending Plaintiff's disability. (Tr. 22, 24.) The ALJ presumptively relied on the erroneous May 2006 hip replacement date found in the decision to determine the start of Plaintiff's disability. (Tr. 22 ¶ 2.) From that error, the ALJ believed that the physical consultative exam

performed by Dr. Julius Wolfram was actually a year after the hip replacement surgery, rather that just prior to the hip replacement. (Tr. 22 ¶ 2.) Next, the ALJ compounded the error by relying on the June 19, 2007 report, only three months post surgery, claiming that the report evidences that Plaintiff was doing well. (Tr. 22 ¶ 2; 305.) However, the ALJ failed to note the record in question boldly states, "Right hip pain" of a 5 of 10, loss of right hip range of motion in every axis, and contains a notation of the use of Hydrocodone, a narcotic pain killer. (Tr. 305.) The ALJ also failed to cite Dr. Srivathanakul's record from the same date noting Plaintiff's continued chronic pain. (Tr. 296.) Then, the ALJ erroneously found that the omission of a written record of right hip complaints in August of 2007 during a liver consultation was affirmative evidence of a lack of impairment. (Tr. 22 ¶ 2.) Finally, the ALJ skipped to Plaintiff's July 2008 orthopedic visit, failing to discuss or consider her appointments with Dr. Srivathanakul in June of 2007, as well as in March and April of 2008, for continuing severe right hip pain and onset of severe back pain related to her osteoarthritis, including referrals for orthopedic visits, X-Rays, a lumbar MRI, and epidural lumbar injections. (Tr. 117-19, 296, 304-305, 375-381.) The ALJ picked the single statement "walking makes better" from the July 2008 record that additionally evidenced that Plaintiff was in tremendous pain; that the pain was worse at that time than pre-surgery; that she experienced "popping and grinding" when ambulating, and that she experienced a sensation "like a stick pushing up and down on her leg." (Tr. 303, 496.) Further, her pain was greater when she was sitting; her back and knee pain was 8 of 10; and she ambulated with a limp, requiring the assistance of a cane for ambulation. (*Id*.) Her physical exam revealed right hip flexion was limited to 50 degrees (normal is 130), and extension was also

abnormal. (*Id.*)[5] The ALJ also touched on the October 2008 follow-up with Plaintiff's hip surgeon, Dr. Bucholtz, previously discussed, where again the discussion failed to note complaints of back, knee, and hip pain, and the use of a cane to assist with ambulation. (Tr. 492.) Additionally, the ALJ failed to discuss that the reason for the October 2008 X-Ray was Plaintiff's pain. (Tr. 495.) The X-Ray showed Plaintiff's bones are osteopenic with mild degenerative changes at the left hip. (*Id.*) Dr. Bucholtz scheduled Plaintiff to return to the clinic in six months to repeat the X-Rays. (*Id.*, 493.) Substantial evidence does not support the ALJ's decision that Plaintiff was no longer disabled as of August 29, 2007. The case should be remanded for the Commissioner to consider all of the medical evidence, rather than only evidence the ALJ picked from the record to support the decision that Plaintiff was no longer disabled four months after her hip replacement surgery.

### Whether the Case Must be Remanded Because the ALJ Failed to Indicate Which Listings were Considered or Provide Any Reasoning with Respect to Why Plaintiff's Impairments Failed to Meet the Criteria from the Listings

The ALJ must identify every Listing that could apply to the Claimant. *See Aulder v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). Like the ALJ in *Aulder*, the ALJ failed to identify the listed impairment for which Plaintiff's symptoms failed to qualify. Neither did he provide any explanation as to how he reached the conclusion that Plaintiff's symptoms are insufficiently severe to meet any listed impairment. The ALJ thus failed to indicate the basis of his decision. He made the conclusory statement that: "the claimant has not had an impairment or combination of impairments that meets

---

[5] Although Dr. Eisner could not pinpoint the cause of Plaintiff's continued hip pain, weakness, and loss of range of motion one year after her hip replacement surgery, he believed it was due to continuing abductor weakness and inflammation, and referred her to physical therapy. (*Id.*)

or medically equals one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1." The ALJ failed to identify any specific listing and offered nothing to support this conclusion in Finding No. 12 that no listing was met. Accordingly, the Commissioner failed to make a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based. 42 U.S.C. § 405(b)(1). Plaintiff contends that she met Listing 1.03 Reconstructive Hip Surgery. However, without the necessary detail and explanation of the ALJ, the Court cannot determine whether or not the decision that Plaintiff failed to meet a Listing is based on substantial evidence. *See Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986). Accordingly, Plaintiff was prejudiced and reversal of the ALJ's decision and remand for further proceedings is required.

## Additional Errors to be Considered on Remand

This Court has determined that this case should be reversed and remanded for the reasons previously stated. On remand, the ALJ should address Plaintiff's knee impairment and discuss whether it is severe and whether, considering the combined effects of all impairments, Plaintiff's ability to do work-related activities is affected as set forth in Plaintiff's brief. (Pl.'s Br. 17-18.) Additionally, although the ALJ gave lip service to the required credibility Regulations, he never evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which the symptoms limit her ability to do basic work activities or considered the entire record. On remand, the ALJ will conduct the proper credibility analysis and proper analysis of the evidence in determining Plaintiff's credibility.

With respect to the ALJ's decision that Plaintiff could perform other work, the ALJ's decision was based on the inclusion in the hypothetical to the VE of a sit or stand accommodation where the

Plaintiff could stand and stretch for a short, but undefined period, every 30-45 minutes. (Tr. 57.) This accommodation was not included in the ALJ's determination of Plaintiff's RFC in the decision.[6] (Tr. 25.) Based on the ALJ's hypothetical that included the sit/stand/stretch option, the VE testified that the hypothetical claimant could perform three occupations that were available in sufficient numbers in the national economy. (Tr. 57-58.) The ALJ then determined that Plaintiff could perform those three jobs. The sit or stand accommodation is inconsistent with the Dictionary of Occupational Titles[7] ("D.O.T."). Social Security regulations require that all VE testimony be consistent with the D.O.T. S.S.R. 00-4p. The D.O.T. does not recognize or define a sit or stand accommodation. Accordingly, the VE's testimony that the RFC described in the ALJ's first hypothetical was consistent with the D.O.T. is in error. Thus, new testimony from a VE is required if the case should proceed to the same level on remand.

## Recommendation

---

[6] The ALJ determined that, beginning on August 29, 2007, Plaintiff had the RFC to lift and/or carry 10 pounds occasionally; sit 6 hours in an 8 hour work day, stand and/or walk 2 hours in an 8 hour workday; occasionally use ramps/stairs, balance, stoop, kneel, crouch, and crawl, but should avoid climbing ladders, ropes, and hazards.

[7] *See* Pl.'s App. 48, 52-53.

The Court recommends that the District Court reverse the part of the Commissioner's decision which found that Plaintiff was not disabled after August 29, 2007, and remand the case for a new administrative hearing before an alternative ALJ.

Signed, February 24, 2011.

**PAUL D. STICKNEY**
**UNITED STATES MAGISTRATE JUDGE**

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within fourteen days after service. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).